**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **SHARPER IMPRESSIONS** | : | |
| **PAINTING CO.,** | : | |
| | : | **Case No. 2:21-cv-02245** |
| **Plaintiff,** | : | |
| | : | **Chief Judge Algenon L. Marbley** |
| **v.** | : | |
| | : | **Magistrate Judge Vascura** |
| **MICHAEL THIEDE, et al.** | : | |
| | : | |
| **Defendants.** | : | |

## OPINION & ORDER

This matter is before the Court on Plaintiff Sharper Impressions Painting Co.'s Motion for

a Temporary Restraining Order ("TRO") and Preliminary Injunctive Relief. (ECF No. 2). For the

reasons set forth below, this Court **GRANTS** the Plaintiff's Motion for a TRO.

## I.      BACKGROUND

Plaintiff Sharper Impressions Painting Co. ("Sharper Impressions" or "SIP") seeks a TRO

against Defendants Michael Thiede, Kerry Lynn Thiede, and Kerry's Fine Painting, LLC arising

out of Michael Thiede's prior employment with the company and a subcontractor agreement he

signed incident to that employment.

Sharper Impressions is an interior and exterior painting service with residential and

commercial customers. (ECF No. 2 at 4). Sharper Impressions is an Ohio corporation with its

principal place of business in Plain City, Ohio; Sharper Impressions also operates in Tennessee,

Indiana, Missouri, Kansas, and most relevant here, Georgia. (*Id.*). Sharper Impressions has an

Atlanta office located at 875 Mansell Road, Suite A3 in Roswell, Georgia. (ECF No. 2-1 ¶ 11).

Mr. Thiede was employed by Sharper Impressions as a Sales Manager in the Atlanta area from

February 2014 to December 2020. (ECF No. 2 at 4). When he began his employment on February

19, 2014, he signed a Subcontractor Agreement (the "Agreement"). (*Id.* at 4–5). Notably, the Agreement vests jurisdiction in this Court and Mr. Thiede submitted to this Court's jurisdiction when he entered this agreement. (ECF No. 1 ¶ 11). Sharper Impressions argues that jurisdiction over Ms. Thiede and Kerry's Fine Painting, LLC ("KFP") is proper under O.R.C. § 2307.382(A)(6), which authorizes jurisdiction when defendants "[causes] tortious injury in this state to any person by an act outside this state committed with the purpose of injuring persons, when the person might reasonably have expected that some person would be injured thereby in this state."

### A. The Agreement and Mr. Thiede's Employment

The Agreement contains several relevant provisions as to this suit. The first is the "Restrictive Covenant." This clause reads:

> Manager agrees that during the term of this Agreement, and for a period of eighteen (18) months thereafter (the "Restriction Period"), he will not compete directly or indirectly against SIP within a radius of fifty (50) miles of any office where SIP conducts business (the "Restrictive Covenant"). Manager agrees and acknowledges that the Restrictive Covenant is reasonable and that his contract is in consideration of his agreement to abide by it. Manager further agrees that if he violates the Restrictive Covenant, there is no adequate remedy at law and SIP is entitled to immediate injunctive relief. If the Manager breaches this Restrictive Covenant, the Restriction Period shall automatically toll from the date of the first breach, and all subsequent breaches, until the resolution of the breach through private settlement, judicial or other action, including all appeals. The Restriction Period shall continue upon the effective date of any such settlement judicial or other resolution.

(ECF No. 2-1, Ex. A ¶ 4). The next clause sets forth what constitutes direct or indirect competition within the meaning of the Restrictive Covenant. The Agreement notes this conduct includes, but is not limited to, the following behavior:

- Directly or indirectly owning or managing a residential or commercial painting business.

- Providing services to[,] as an employee or independent contractor, a residential or commercial painting business.

- Soliciting or encouraging any of SIP's employees or contractors to work for, or provide services to, another residential or commercial painting business.

- Soliciting or encouraging any of SIP's customers or potential customers on behalf of any other person or entity for residential or commercial painting services.

(*Id.* ¶ 5).

The Agreement also contains a "Confidentiality Restriction," wherein Mr. Thiede "agree[d] to protect the confidentiality of SIP's confidential and trade secret information during the term of this Agreement and at all times thereafter." (*Id.* ¶ 6). The Agreement then defines "confidential and trade secret information" as inclusive of, "among other things," the following items:

- Names and addresses of other SIP employees or contractors.

- Names and addresses of any of the SIP contractors, subcontractors, vendors or customers, including the terms of any agreements or understandings with them.

- SIP's concepts, plans, means, methods, products, drawings, specifications, data, business practices, contract or quote forms, business software, business and marking [*sic*] strategies, bidding strategies, customer lists and information.

(*Id.* ¶ 7). For any violation of the Confidentiality Restriction, the Agreement provides that Mr. Thiede "agree[d] and acknowledge[d] that there is no adequate remedy at law for his unauthorized use or disclosure of SIP's confidential or trade secret information, and that SIP would be entitled to immediate injunctive relief." (*Id.* ¶ 8).

Mr. Thiede began his employment on February 19, 2014. (ECF No. 2-1 ¶ 3). Prior to beginning his employment, Mr. Thiede had no experience in the professional painting industry. (*Id.* ¶ 4). Sharper Impressions "invested considerable time and resources" to train him on the business and industry, including how to sell painting services, how to interact with customers, how to staff and manage painting projects, and how to make productive use of the propriety information

3

systems developed by SIP "over decades in business." (*Id.*). Mr. Thiede had a high level of autonomy in his territory and had "little to no direct supervision of his day-to-day activities." (*Id.* ¶ 5). He had sole responsibility for meeting with clients, negotiating the prices of services, and negotiating and entering contracts with vendors on SIP's behalf, without prior approval. (*Id.*). He also recruited and managed independent painting contractors on behalf of SIP. (*Id.*). Mr. Thiede controlled "all quoting and project management duties" using SIP's proprietary software, on a computer provided by his employer. (*Id.*).

During his employment, Mr. Thiede had access to myriad confidential and sensitive competitive business information. This included proprietary software and business systems and strategies, customer quotes and pricing, customer lists, contact information and contracts, direct mail lists, subcontractor lists, contracts and contacts, information relating to subcontractor performance quality and skill, vendor contacts and pricing, customer satisfaction forms, and training materials. (*Id.* ¶ 6).

In summer of 2020, Mr. Thiede told Geoff Sharp, the Founder and President of Sharper Impressions, that he would be leaving in December 2020. (*Id.* ¶ 8). He represented that he planned to work full-time with a family friend to purchase and "flip" houses. (*Id.*). On or about December 17, 2020, Mr. Thiede's employment with SIP ended. (*Id.*).

## B.     The Creation of Kerry's Fine Painting, LLC

Kerry's Fine Painting, LLC ("KFP") came into corporate existence on April 22, 2020, when Kerry Lynn Thiede registered it as a new business in Cobb County, Georgia. (ECF No. 2-1, Ex. B). The principal place of business is indicated as 4990 Hill Road NW in Acworth, Georgia, which Mr. Sharp represents is the Thiedes' home address. (ECF No. 2-1 ¶ 11; ECF No. 2-1, Ex. B). This address is within fifty miles of the Sharper Impressions office in Atlanta. (ECF No. 2-1

¶¶ 11–12; ECF No. 2-1, Ex. C). KFP was incorporated as a Georgia limited liability company on April 1, 2021; it previously operated as an unincorporated business. (ECF No. 2 at 9; ECF No. 2-1 ¶ 15; ECF No. 2-1, Ex. F). KFP has a website to advertise its services and the domain was created on June 3, 2020. (ECF No. 2-1 ¶¶ 13–14). KFP has received eleven Google Reviews from customers since June 2020. (ECF No. 2 at 9). Thus, KFP was at least semi-operational for eight months while Mr. Thiede was still working with SIP.

While Kerry Thiede is listed on the business license and the incorporation documents, the Plaintiff argues that both Mr. and Mrs. Thiede are involved with the business. (ECF No. 2 at 8). Mr. Sharp has known the couple since 2014 and has no knowledge of Mrs. Thiede having any experience in either the construction industry or the painting industry. (ECF No. 2-1 ¶ 22). He represents that she has worked full-time since he has known her in a position outside of the professional painting industry. (*Id.*). The Plaintiff characterizes her involvement in KFP as a "ruse" intended to obscure Mr. Thiede's involvement. (ECF No. 2 at 11). Plaintiff highlights that some Google Reviews demonstrate Mr. Thiede's involvement in the company. In one review, the customer refers to an estimate provided by "Michael"; in another, a customer refers to "Kerry" but uses masculine pronouns. (ECF No. 2 at 10; ECF No. 2-1, Ex. G). Mr. Thiede's SIP-issued laptop also contained references to "sales@kerrysfineprinting.com," according to a forensic analyst retained by SIP. (ECF No. 2 at 11; ECF No. 2-2 ¶ 4).

## C.    Competition by KFP During Mr. Thiede's Employment

The Plaintiff argues that Mr. Thiede began to violate the Agreement while he was still an employee of SIP. SIP accuses Mr. Thiede, in concert with the other two Defendants, of violating the Restrictive Covenant by: actively competing and continuing to compete against SIP; soliciting or encouraging customers or potential customers of SIP to become customers of KFP; and

soliciting or encouraging SIP's painting contractors to become contractors with KFP. (ECF No. 2 at 10–11). As discussed above, Plaintiff purports that Mr. Thiede was involved in the formation of a direct competitor to SIP or, at the very least, worked for the company. The Plaintiff puts forth the following other evidence of KFP's competition with SIP during Mr. Thiede's employment.

First, at least three of the eleven public Google Reviews for KFP were left by individuals who had been customers of Sharper Impressions. (ECF No. 2 at 9; ECF No. 2-1 ¶ 17). These individuals hired Sharper Impressions for painting jobs while Mr. Thiede was still employed with the company.

Second, Mr. Thiede put together a quote for SIP for at least one of those individuals in October 2020. (ECF No. 2 at 9; ECF No. 2-1 ¶ 18). This customer did not select SIP and later posted an online review for KFP. (*Id.*).

Third, Mr. Thiede and KFP recruited at least one of SIP's "best painting contractors." (ECF No. 2 at 10). One Google Review references the contractor at issue, Felix Paque, by name. (ECF No. 2 at 10; ECF No. 2-1 ¶¶ 19–20). Mr. Paque is also pictured on KFP's website. (ECF No. 2-1 ¶ 19). The Plaintiff represents that at least two other painting contractors who work with SIP now also work with KFP. (ECF No. 2 at 10; ECF No. 2-1 ¶ 20).

Fourth, KFP's website shows a large painting project completed at Cedarcrest Church in Acworth, Georgia. (ECF No. 2 at 10). Cedarcrest had been a customer of Sharper Impressions and Sharper Impressions bid on work in early 2020 for the same project depicted, with Mr. Thiede "heavily involved in the bid." (ECF No. 2 at 10; ECF No. 2-1 ¶ 21; ECF No. 2-1, Ex. D). Mr. Thiede told Mr. Sharp that a different contractor with a lower bid had gotten the work. (ECF No. 2 at 10; ECF No. 2-1 ¶ 21). SIP argues that Mr. Thiede and KFP misappropriated trade secret information to undercut SIP's bid and secure the project. (*Id.*).

6

### D.      Destruction of Information

Mr. Thiede also personally retained SIP's valuable business information, while destroying that information on his work-issued computer before he returned the equipment to SIP. When Mr. Thiede left employment with SIP in December 2020, he was to return all company property. (ECF No. 2 at 11–12; ECF No. 2-1 ¶ 23). Mr. Thiede's SIP-issued cell phone contained extensive contact information and communications. (*Id.*). His SIP issued laptop contained a trove of "highly confidential and proprietary trade secret information," including but not limited to: proprietary quoting and production management software; customer database information; proprietary direct mailing lists; lists of painting subcontractors; and historical customer information and quotes for SIP's Atlanta-area business from  February 2014 through December 2020. (*Id.*). Some of this information was preserved only on Mr. Thiede's work laptop and SIP could not otherwise access this information. (*Id.*).

Mr. Thiede ignored numerous requests for the return of this company property. (*Id.*). On January 12, 2021, Mr. Thiede informed SIP he had left the phone and laptop at a paint store located two hours outside of the Atlanta area. (ECF No. 2 at 12; ECF No. 2-1 ¶ 24). When Sharper Impressions retrieved the property, it learned that the SIM card was missing from the cell phone. (ECF No. 2 at 12; ECF No. 2-1 ¶ 25). SIP retained a digital forensics firm to analyze data on the laptop. The forensic analysis revealed that on December 16, 2020, "a number of Sharper Impressions files were accessed on the laptop" within the same general timeframe that the user accessed OneDrive, a cloud storage service, and live.com, a cloud-based email system. (ECF No. 2-2 ¶ 4(f)). The analysis also showed that, on the evening of January 11, 2021—just before the laptop was abandoned—at least 194,523 files on the laptop were mass deleted. (ECF No. 2 at 12; ECF No. 2-2 ¶ 4(a)). At 11:28 p.m., a new operating system was installed on the laptop. (ECF No.

2 at 12; ECF No. 2-2 ¶ 4(b)). The analyst notes that the mass deletion occurred prior to or as a result of the installation. (*Id.*). The forensic analyst was able to recover some of the files, while others were corrupted or fragmented. (ECF No. 2 at 12; ECF No. 2-2 ¶ 4(c). At present, the extent of permanent loss is still unknown. (ECF No. 2-2 ¶ 4(f)).

### E.    Procedural History

Sharper Impressions filed its Complaint and Motion for a Temporary Restraining Order and Preliminary Injunction on May 3, 2021. (ECF Nos. 1, 2). In its Complaint, Sharper Impressions asserts the following claims: breach of the Agreement against Mr. Thiede; tortious interference with contract against Mrs. Thiede and KFP; tortious interference with business relationships, injunctive relief, trade secret violations, and violation of the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 *et seq.* against all Defendants; and conversion and spoliation against Mr. Thiede and KFP. Sharper Impressions seeks the following relief of this Court:

(1) enjoining Defendants from operating the competing business and from any further improper use and/or disclosure of Plaintiff's trade secrets;

(2) requiring Defendants to immediately provide to Plaintiff any and all information in Defendants' possession that relates to Plaintiff's business, customers, or contractors;

(3) enjoining Michael Thiede, and all persons acting in concert with him including Kerry Thiede and KFP from:

(a) directly or indirectly owning or managing a residential commercial painting business;

(b) providing services as an employee or independent contractor to a residential or commercial painting business;

(c) soliciting or encouraging SIP's employees or contractors to work for or provide services to another residential or commercials painting business; or

(d) soliciting SIP's customers or potential customers on behalf of any other person or entity for residential or commercial painting services or

encouraging such customers to obtain painting services from a company other than SIP;

and

(4) directing Defendants to preserve all evidence until this Court can more fully hear this dispute after Plaintiff has had sufficient opportunity to conduct expedited discovery.

(ECF No. 2 at 1–2). The parties appeared before this Court at 3:00 p.m. on Friday, May 7, 2021, at which time this Court heard arguments on the merits as to the Plaintiff's Motion for a TRO.

## II.      STANDARD OF REVIEW

A Temporary Restraining Order ("TRO") is an emergency measure. *See McGirr v. Rehme*, Case No. 16-464, 2017 U.S. Dist. LEXIS 61151, at *10 (S.D. Ohio Apr. 21, 2017). Federal Rule of Civil Procedure 65(b) requires a court to examine, on application for a temporary restraining order, whether "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant." Fed. R. Civ. P. 65(b)(1)(A). A temporary restraining order is meant "to prevent immediate and irreparable harm to the complaining party during the period necessary to conduct a hearing on a preliminary injunction." *Dow Chemical Co. v. Blum*, 469 F. Supp. 892, 901 (E.D. Mich. 1979).

To obtain temporary injunctive relief, it is of paramount importance that the party establish immediacy and irreparability of injury. *See Doe v. Univ. of Cincinnati*, No. 1:15-CV-600, 2015 WL 5729328, at *1 (S.D. Ohio Sept. 30, 2015) (noting that "standard for issuing a temporary restraining order is logically the same as for a preliminary injunction with emphasis, however, on irreparable harm given that the purpose of a temporary restraining order is to maintain the status quo") (citing *Motor Vehicle Bd. of Cal. v. Fox*, 434 U.S. 1345, 1347 n.2 (1977)). While a Court is permitted to consider the other factors, immediacy and irreparability of harm are threshold considerations since "[a] temporary restraining order is an extraordinary remedy whose purpose is

to preserve the status quo." *Marshall v. Ohio Univ.*, No. 2:15-CV-775, 2015 WL 1179955, at \*4 (S.D. Ohio Mar. 13, 2015) (citing *Proctor & Gamble Co. v. Bankers Tr. Co.*, 78 F.3d 219, 226 (6th Cir. 1996)). The "burden of proving that the circumstances 'clearly demand' such an extraordinary remedy is a heavy one" since "[t]he party seeking the injunction must establish its case by clear and convincing evidence.'" *Id.* (citing *Overstreet v. Lexington–Fayette Urban Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002); *Honeywell, Inc. v. Brewer–Garrett Co.*, 145 F.3d 1331 (6th Cir. 1998)).

### III. ANALYSIS

#### A. Immediacy of Harm

The first factor the Court must consider is the immediacy of harm that Plaintiff would face absent injunctive relief. This Court has emphasized the "paramount importance" that a plaintiff establishes "immediacy and irreparability of injury" in order to receive a temporary restraining order because they are "threshold considerations." *Hartman v. Acton*, --- F. Supp. 3d ----, No. 2:20-CV-1952, 2020 WL 1932896, at \*2 (S.D. Ohio Apr. 21, 2020). Sharper Impressions argues that it is injured by the breach of the Agreement, emphasizing that Mr. Thiede used SIP's customer information and knowledge, as well as relationships with customers and contractors, to compete with SIP. (ECF No. 2 at 17). He breached the Agreement while still an employee and continues to be in breach through the present. SIP was placed on notice of a potential breach of the Agreement around late March or early April 2021, at which point the company began to investigate and eventually filed the pending Motion for a TRO.

Courts regularly deny an employer's request for injunctive relief when the employer delays seeking judicial relief after a former employee begins working for a competitor. This Court recently declined to issue emergency injunctive relief where the employer waited nearly 11 months

to bring suit, including delaying for six months after it began actively trying to recover the confidential information. *See Sarnova HC, LLC v. Reetz*, No. 2:21-cv-0601, 2021 WL 1257081, at \*4 (S.D. Ohio Apr. 5, 2021). This Court found that the significantly delay undermined the Plaintiff's request "because its lack of urgency suggests that it does not need immediate injunctive relief." *Id.*; *see also Total Quality Logistics, LLC v. III's Hotshot, Inc.*, No. 1:17-CV-352, 2017 WL 5972001, at \*4 (S.D. Ohio Dec. 1, 2017) (finding that employer's ten-month "delay in bringing its claims severely undermine[d] its request for emergency injunctive relief"). Ohio courts likewise find injunctive relief inappropriate where an employer is slow to enforce a restrictive covenant in an employment agreement. *See Areo Fulfillment Servs., Inc. v. Tartar*, No. C-060071, 2007-Ohio-174, 2007 WL 120695, at \*5 (Ohio Ct. App. Jan. 19, 2007) (affirming denial for injunctive relief where employer waited almost ten months to seek relief because "considerable" delay "substantially weakened" any assertion of irreparable harm); *see also Kyrkos v. Superior Bev. Grp., Ltd.*, No. 99444, 2013-Ohio-4597, 2013 WL 5676256, at \*3 (Ohio Ct. App. Oct. 13, 2017) (reversing lower court's grant of a preliminary injunction and noting that employer had failed to assert rights under the non-compete for five months, despite being on notice of employee's new position).

When SIP became aware of the existence of KFP and Mr. Thiede's potential involvement with the company this spring, SIP commenced investigations and, within one month, brought suit in this Court to enforce the Agreement. Both parties represent that painting is a seasonal business and that season is now beginning in earnest with the arrival of favorable weather. As the painting season begins, each potential job by KFP in the area of the Restrictive Covenant represents an immediate harm to SIP. SIP represents that KFP is currently active in the region. SIP's incentive

to enforce the terms of the Agreement, and to prevent further interference with its business operations in Atlanta, is at its strongest point. The Agreement also provide that SIP would be entitled to immediate injunctive relief in the event of a breach.

Additionally, when Mr. Thiede left his employment with SIP in mid-December 2020, he initially failed to return either his work cell phone or laptop. On January 12, 2021, Mr. Thiede returned the items under peculiar circumstances: he purportedly left the items at a paint store two hours outside of Atlanta. SIP immediately noticed the SIM card was missing from the phone. The Plaintiff later retained the services of a forensic expert to examine the laptop computer, which had been wiped or otherwise corrupted. Upon representation of SIP, the company has no other means of accessing the valuable business information contained on those devices because Mr. Thiede was granted such a degree of independence in his territory. Putting aside whether this constitutes good business judgment, the continued misappropriation of or reliance on any of SIP's confidential information or trade secrets presents an immediate harm to SIP. While this information remains in the possession of a competitor, it presents an immediate threat of harm to SIP's business prospects and a boon to Mr. Thiede and KFP.

SIP's timely enforcement of its rights under the Agreement and the continued potential for spoliation or further misappropriation of valuable business information both demonstrate that SIP faces immediate harm in the absence of a TRO. Furthermore, the Agreement at issue entitles SIP to *immediate* injunctive relief. This factor weighs in favor of granting temporary injunctive relief.

### B.    Irreparability of Harm

The second factor the Court must consider in determining whether to grant a TRO is the irreparability of harm that Plaintiff will face absent injunctive relief. Fed. R. Civ. P. 65 (b)(1)(A). This factor is "indispensable: If the plaintiff isn't facing irreparable harm, there's no need to grant

relief *now* as opposed to at the end of the lawsuit." *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 326 (6th Cir. 2019) (emphasis in original). In general, the Sixth Circuit finds that an employer is likely to suffer irreparable harm when an employee breaches a noncompetition covenant, due to loss of fair competition. *Basicomputer Corp. v. Scott*, 973 F.2d 507, 512 (6th Cir. 1992); *see also AK Steel Corp. v. Miskovich*, No. 1:14CV174, 2014 WL 11881030, at *5 (S.D. Ohio Mar. 3, 2014) (finding that "loss of goodwill and fair competition is likely to irreparably harm an employer"). When harm is fully compensable by money damages, it is not irreparable. *See Basicomputer*, 973 F.3d at 511. When a plaintiff's loss would make damages difficult to calculate, however, an injury will no longer be fully compensable by money damages. *See id.* (citing *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984)). The Sixth Circuit has found that lost profits are calculable and compensable through monetary damages, but loss of goodwill is not. *See Collins Inkjet Corp. v. Eastman Kodak Co.*, 781 F.3d 264, 279 (6th Cir. 2015) (pointing out that corresponding "harm [to] goodwill and competitive position . . . would be hard to compensate").

Sharper Impressions invokes *Basicomputer* and contends that it has been irreparably harmed by the use of customer information and knowledge, as well as customer and contractor relationships, by a competitor. (ECF No. 2 at 17). The Plaintiff emphasizes several other elements that contribute to the irreparability of its harm. First, Mr. Thiede destroyed customer information on the laptop and has not returned his SIM card. (*Id.*). Second, SIP is harmed by the recruitment of painting contractors because it cannot complete as many contracts as it previously could and the quality of its work is threatened. (*Id.*). The company must spend time and money to identify and recruit new contractors, before spending additional time and money on training and the development of relationships. (*Id.*). Mr. Sharp attests that SIP has had difficulty replacing the contractors that the Defendants recruited. (*Id.*; ECF No. 2-1 ¶ 29). Third, SIP reiterates that it

13

believes the Defendants' stole its customers and misappropriated trade secret information. (ECF No. 2 at 17). Sharper Impressions argues that the precise impact of the Defendants' actions will be difficult to qualify, "both because of the difficulty in determining how long losses will be incurred and because, even where such loss can be traced, the lost value of existing relationships is difficult to quantify." (*Id.* at 17–18).

Courts overwhelmingly find irreparable harm where a business loses clients or suffers a loss of fair competition after the breach of a restrictive covenant in an employment contract. In *Hall v. Edgewood Partners Insurance Center, Inc.*, the Sixth Circuit found no error in a lower court's finding of irreparable harm where it would be "impossible to know what additional business [lost] clients and their goodwill might generate." 878 F.3d 524, 530 (6th Cir. 2017). *Basicomputer* is particularly instructive because the Sixth Circuit affirmed a lower court finding that determined irreparable harm had resulted when defendants had accessed confidential customer information, removed much of the information when they left, promptly began contacting customers, and had access to pricing information that could be used to underbid their former employer. 973 F.3d at 512. After *Basicorp*, the Sixth Circuit continues to endorse the principle that irreparable injury results from the breach of restrictive covenant where damage to customer relationships and competition between companies would be difficult or impossible to calculate. *See FirstEnergy Solutions Corp. v. Fleric*, 521 F. App'x 521, 529 (6th Cir. 2013) (affirming court's finding of irreparable injury where testimony established contact between former employee and customers because company "may never be able to recover that lost business"); *see also Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 550 (6th Cir. 2007) (finding "likely interference with customer relationships" and "loss of fair competition" resulting from breach of agreement would be difficult to calculate and was thus irreparable).

14

Decisions by federal trial courts on injunctive relief further affirm this principle. Of particular relevance here is the Northern District of Ohio's recent decision in *Union Home Mortgage Corp v. Cromer*, No. 4:21CV0385, 2021 WL 1601193 (N.D. Ohio Apr. 23, 2021). In *Cromer*, the court took note of a particular provision in the employment agreement when it was assessing irreparable harm. The employee, by signing the agreement, had agreed that violation of the agreement's restrictive covenants would cause irreparable harm to the employer and he "consent[ed] to the issuance of a restraining order and/or an injunction by a court of competent jurisdiction." 2021 WL 1601193, at *7 (quoting employment agreement). Mr. Thiede's subcontractor agreement contains a similar, but not identical, provision as part of the Restrictive Covenant. Mr. Thiede "agree[d] that if he violates the Restrictive Covenant, there is no adequate remedy at law and SIP is entitled to immediate injunctive relief." (ECF No. 2-2, Ex. A ¶ 4). Even in the absence of such contractual language, courts in the Southern District of Ohio have consistently found irreparable harm in similar factual circumstances. *See, e.g.*, *Reco Equipment, Inc. v. Wilson*, No. 2:20-cv-3556, 2020 WL 6823119, at *17 (S.D. Ohio Nov. 20, 2020) (finding irreparable harm where defendant downloaded confidential and proprietary information and wiped company-issued phone and computer prior to their return, before going to work for competitor); *ApplianceSmart, Inc. v. DeMatteo*, No. 2:18-CV-1729, 2018 WL 6727094, at *2 (S.D. Ohio Dec. 21, 2018) (granting TRO and noting that misappropriation of trade secrets is an irreparable loss for which monetary damages would not suffice to make a party complete); *Novak v. Farneman*, No. 2:10-CV-768, 2010 WL 4643002, at *6 (S.D. Ohio Nov. 9, 2010) (denying injunctive relief but acknowledging that "[i]rreparable harm generally results from misappropriation of intellectual property by a competitor because of the potential for lasting and unjust competitive harm that would otherwise not occur") (internal citations omitted)).

Similar principles are enshrined in Ohio precedents. "Irreparable harm is one for the redress of which, after its occurrence, there could be no plain, adequate and complete remedy at law" and for which monetary damages would be "impossible, difficult, or incomplete." *Cleveland v. Cleveland Elec. Illumination Co.*, 684 N.E.2d 343, 350 (Ohio Ct. App. 1996). Under Ohio law, even the "threat of harm is a sufficient basis" for granting injunctive relief. *Procter & Gamble Co. v. Stoneham*, 747 N.E.2d 268, 273 (Ohio Ct. App. 2000). When an employee possess knowledge of an employer's trade secrets then begins to work in a position to directly compete with the former employer or product line, courts have found an actual threat of harm existed. *See Jacono v. Invacare Corp.*, No. 86605, 2006-Ohio-1596, 2006 WL 832451, at *7 (Ohio Ct. App. Mar. 30, 2006). Like the Sixth Circuit, Ohio law counsels that harm or threat of harm is not irreparable if money damages can serve as an adequate remedy. *Id.* (citing *Fraternal Order of Police v. Cleveland*, 749 N.E.2d 840 (Ohio Ct. App. 2001)); *see also Cleveland Elec.*, 684 N.E.2d at 350. In line with these legal principles, courts have found that injunctive relief is warranted when a plaintiff establishes that an employee "gained intimate knowledge of an employer's trade secrets and confidential information and has begun working for a competitor in a substantially similar capacity." *Jacono*, 2006 WL 832451, at *7 (citing *Procter & Gamble*, 747 N.E.2d at 273).

Like the immediacy of harm factor, this factor also weighs in favor of granting temporary injunctive relief. The Plaintiff has made a strong showing on the irreparable harm factor under both federal and state precedents, which consistently recognize that loss of fair competition, damage to business relationships, and misappropriation of trade secrets may all constitute irreparable harm. The irreparable harm commenced before Mr. Thiede had even left employment with SIP and has continued through the present. The Plaintiff has already identified at least three previous clients that have now become clients of the Defendants. Regardless of the reasons those

16

clients may have chosen KFP over SIP, Mr. Thiede's alleged involvement with KFP muddies the waters. By becoming entangled at any point with Mr. Thiede, who is bound by the Agreement, Mrs. Thiede and KFP's conduct become at issue, as well. Similarly, the retention of the SIM card bars SIP access from myriad client contact information and communications. If the laptop computer was intentionally wiped to prevent SIP from being able to access its own corporate information, that harm may well prove irreparable, too. If Mr. Thiede downloaded this business information for his own gain onto cloud storage and any of the Defendants benefitted from that information, this too may be an incalculable harm for the purpose of monetary damages. The loss of clients and proprietary information, as well as the general damage to fair competition and business relationships, all support the Plaintiff's request for temporary injunctive relief.

The Court concludes Plaintiff has sufficiently demonstrated the immediacy of harm and irreparability of injury it would face absent the issuance of a TRO. The Court finds that the issuance of a TRO to maintain the status quo is justified to prevent the immediate and irreparable harm to SIP while the Parties proceed with expedited discovery and brief the preliminary injunction.

## IV.     CONCLUSION

For these reasons stated above, the Court **GRANTS** Plaintiff's Motion for a Temporary Restraining Order (ECF No. 2) as follows:

1.     Defendant Thiede, as well as those persons acting in active concert or participation with him, including, without limitation, Defendant Kerry's Fine Painting, LLC ("KFP") and Defendant Kerry Lynn Thiede ("Kerry Thiede"), shall not directly or indirectly violate the terms of Thiede's Agreement with Sharper Impressions, by doing any of the following within a 50-mile radius of any office of Sharper Impressions:

      b.   directly or indirectly competing with Sharper Impressions;

    c.   directly or indirectly owning or managing a residential or commercial painting business;

    d.   providing services as an employee or independent contractor to a residential or commercial painting business;

    e.   soliciting or encouraging Sharper Impressions' employees or contractors to work for or provide services to another residential or commercial painting business;

    f.   directly or indirectly employing Sharper Impressions' employees or contractors in another residential or commercial painting business;

    g.   soliciting or encouraging Sharper Impressions' customers or potential customers on behalf of any other person or entity for residential or commercial painting services;

    h.   directly or indirectly providing painting services to Sharper Impressions' customers or potential customers through another residential or commercial painting business; or

    i.   directly or indirectly accessing, disclosing, communicating, or otherwise using Sharper Impressions' property, trade secrets or confidential information, including but not limited to information contained on the SIM card and any and all other information of any kind concerning Sharper Impressions' business, customers, employees and subcontractors.

2.     The Court further orders Defendants forthwith to return to Sharper Impressions through Sharper Impressions' counsel, all property of Sharper Impressions of any kind, including but not limited to the converted SIM card, and any and all confidential and trade secret information and information of any kind concerning Sharper Impressions' business, customers, employees and subcontractors.

3.     The Plaintiff shall post a bond with the Clerk of this Court of $500.00 by close of business on **May 11, 2021**.

The Preliminary Injunction hearing will be held on **May 20, 2021 at 10:00 a.m.** before the Honorable Algenon L. Marbley in Court Room 1, Room 331 of the U.S. Courthouse located at 85 Marconi Boulevard, Columbus, Ohio. The Court will not continue the hearing date except upon

written motion supported by an affidavit demonstrating exceptional circumstances, made immediately upon the party's or counsel's receipt of notice of the existence of the exceptional circumstances.

This Court directs the Parties to file their briefs by **12 p.m.** on **Monday, May 17, 2021**. Both Parties are entitled to file replies, due by **12 p.m.** on **Wednesday, May 19, 2021**. The Parties should discuss the four factors for issuance of a preliminary injunction in their briefs: (1) whether the movant has a strong likelihood of success on the merits; (2) whether the movant would suffer irreparable injury absent the injunction; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by the issuance of the injunction.

The Court shall handle all discovery disputes for the purposes of the Preliminary Injunction briefing. The Court directs the parties to reach an agreement on an expedited discovery schedule.

**IT IS SO ORDERED.**

**ALGENON L. MARBLEY**
**CHIEF UNITED STATES DISTRICT JUDGE**

**DATE: May 11, 2021**

19